

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2002 JUL 23 PM 2: 04
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNIESA WILSON,<br>on behalf of the minor child<br>SHAWN DUNCAN, JR., TIGA<br>BRYANT, on behalf of the minor<br>child, DEZERO BRYANT and HANNAH<br>McKENZIE | * <br> * <br> * | CIVIL ACTION<br><br>NUMBER: **02-2244**<br>**SECT. R MAG. 1** |
| VERSUS | * | SECTION: |
| SHERIFF CHARLES C. FOTI,<br>DR. RICHARD D. INGLESE,<br>DR. MICHAEL HIGGINS,<br>DR. LESZEK MICHALEWICZ,<br>DR. SAMUEL GORE, DR. DOROTA<br>GAWLAS, DR. HOWARD OSOFSKY,<br>PAUL THOMAS, R.N.,<br>LPN CHERYL BLAKE, LPN JUDY<br>COLEMAN, LPN SHAWN VIVERETTE<br>LPN ROBERT GATES, CLERK<br>SHAMATA KING,   SGT. JERROD<br>SPINNEY, DEPUTY TERRY HAYNES,<br>DEPUTY CYNTHIA CARTER, DEPUTY<br>M. DOMINICI, WARDEN WILLIAM SHORT | * <br> * <br> * <br> * <br> * <br> * | JUDGE:<br>  MAGISTRATE:<br><br>CIVIL RIGHTS<br><br>Under 42 USC 1983 and 1988<br><br>JURY TRIAL |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **COMPLAINT**

### I. **JURISDICTION**

1.      This action is brought pursuant to 42 U.S.C. 1983 and 1988 and pursuant to

the First, Fourth, Sixth, Eighth and Fourteenth Amendments and Article IV (Privileges and

1



Fee _150.00_
___ Process _____
X__ Dktd _____
___ CtRmDep_____
Doc. No _____

Immunities clause) of the United States Constitution.  Jurisdiction is founded on 28 U.S.C. Sections 1331 and 1343 and the aforementioned statutory and constitutional provisions. Plaintiffs further invoke the pendant jurisdiction of this Court to consider claims arising under state law pursuant to 28 USC Section 1367.  A jury trial is requested.

## II. **PARTY PLAINTIFFS**

2.      Shawn Duncan, Jr. is the minor child of Shawn Duncan, Sr. (deceased) and appears through his mother and tutor Donniesa Wilson, who is a person of the full age of majority and a resident of the Eastern District of Louisiana. Dezero Bryant is the minor child of Shawn Duncan, Sr. (deceased) and appears through his mother and tutor, Tiga Bryant, who is a person of the full age of majority and a resident of the Eastern District of Louisiana. Hannah McKenzie is the mother of Shawn Duncan, Sr., (deceased), is a person of the full age of majority and is a resident of the Eastern District of Louisiana.

## III. **PARTY DEFENDANTS**

3.      Defendant Sheriff Charles C. Foti is a person of the full age of majority and a resident of the Eastern District of Louisiana.  At all times described herein, he was the Criminal Sheriff of Orleans Parish and, as such, is responsible for the hiring, training, supervision, discipline and control of the deputies under his command, as well as medical personnel.  He is also responsible for the supervision, administration, policies, practices, customs and operations of the Orleans Parish Criminal Sheriff's Office (OPSCO) and its correctional facilities.  He is a final policymaker. He is sued in his individual and official capacity.  He is liable both directly and vicariously for the actions complained of herein.

4.      Defendant Dr. Richard D. Inglese is the Medical Director of the Orleans

Parish Criminal Sheriff's Office and is an employee of the defendant Sheriff Foti. At all pertinent times herein he was the on-site Health Authority for OPCSO and was responsible for the provision of medical care to persons incarcerated in OPCSO facilities, both directly and as a supervisor. He was responsible for recommending and hiring qualified health care professionals and staff, insuring adequate staffing for the medical needs of prisoners and for the supervision, training and monitoring of personnel and medical services at OPCSO correctional facilities to insure access of prisoners to reasonable and adequate health care. He is responsible for supervising the development, reviewing and revising of policies, procedures and practices of the Medical Program and is a final policymaker with regard to the provision of medical and psychiatric services to persons in the custody of the OPCSO. He was responsible for the direction and supervision of defendant Dr. Higgins. Defendant Inglese was also responsible for providing and supervising direct patient care to Shawn Duncan, Sr. at the time of Duncan's death. He is sued in his individual and official capacity. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

　　　　5.　　Defendant Dr. Michael Higgins is the Mental Health Director for the Orleans Parish Prison, and at all pertinent times herein, provided psychiatric services to prisoners in the custody of defendants Foti and the OPCSO via a contract between the Board of Supervisors, Louisiana State University and Agricultural and Mechanical College (hereafter LSU) and defendant Foti. Among other duties, Dr. Higgins was responsible for the design, development and implementation of a program of psychiatric services within OPCSO, including responsibility for maintaining and improving program standards and policies, procedures and practices for delivery of mental health care to prisoners in the custody of

3

defendant Foti. His responsibilities included co-ordinating and monitoring day-to-day operations of the Mental Health Services Program to ensure delivery of adequate and appropriate mental health care to inmates housed in OPCSO facilities. He was also responsible for direct supervision of all staff psychiatrists, psychiatric social workers and residents, including all scheduling. He was responsible for providing direct clinical services to prisoners, including Shawn Duncan, Sr., and was responsible for insuring that his patients would receive necessary and appropriate medical attention in his absence. He is a final policymaker with regard to the provision of psychiatric services to persons in the custody of the OPCSO. He is sued in his individual capacity. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

6.    Defendants Dr. Leszek Michalewicz and Dr. Dorota Gawlas, are residents enrolled in a training program with the LSU School of Medicine, Dept. of Psychiatry, who provided medical services to Shawn Duncan, Sr., (deceased), in August, 2001, pursuant to a contract between LSU and defendant Sheriff Foti. They are each persons of the full age of majority and on information and belief, are residents of the Eastern District of Louisiana. They are sued in their individual capacity.

7.    Defendant Dr. Samuel Gore is a physician employed by defendant Sheriff Foti and the OPCSO who provided medical services to Shawn Duncan, Sr., (deceased), in August, 2001. He is a person of the full age of majority and on information and belief, is a resident of the Eastern District of Louisiana. He is sued in his individual and official capacity.

8.    Defendant Dr. Howard Osofsky is an employee of the Board of Supervisors, LSU, is chair of the LSU Medical School Department of Psychiatry and is responsible for

4

the direction, control and supervision of faculty, fellow and resident activities, including those of defendants herein, conducted at the Orleans Parish Sheriff's Office jail facilities pursuant to a contract entered into between defendant Foti and  LSU to provide psychiatric services to prisoners at the jail. Defendant Osofsky is responsible for assigning medical professionals to work at the jail and for overseeing the activities of the Program Director for the psychiatric services.  As part of his duties, he agreed to undertake a  moral, ethical and legal responsibility for the responsible management of the care of patients at the jail. He is responsible for scheduling and staffing decisions. He is a final policymaker and is  sued in his individual capacity. He is a person of the full age of majority and, on information and belief, a resident of the Eastern District of Louisiana.

9.    Defendant Paul Thomas was the Director of Nursing (DON) at all pertinent times herein and an employee of defendant Foti and OPCSO. He was responsible for the supervision and co-ordination of nursing services, including co-ordinating physician/nursing sick call and follow-up care. He is responsible for insuring that appropriate nursing care is given to persons in restraints in the psychiatric wards in the jail, including Shawn Duncan, Sr.  He is a person of the full age of majority, is sued in his individual and official capacity and on information and belief is a resident of the Eastern District of Louisiana.

10.    Defendants Cheryl Blake, Judy Coleman, Shawn Viverette and Robert Gates were each employees of defendant Sheriff Foti in the position of Licensed Practical Nurses (LPN) at all pertinent times herein, and were responsible for triage, performing nurse sick call for inmates in the custody of the OPCSO, including follow-up paperwork and notification necessary for continuity of inmate care, performance of medical treatments and procedures as ordered, and producing and maintaining accurate and legible

5

documentation of all treatments and procedures. They were each responsible for monitoring the medical condition, health and safety of Shawn Duncan, Sr., and providing nursing care to him while he was in restraints, including conducting and accurately reporting regular, periodic observations,  insuring that he received adequate nutrition, hydration and mobility and appropriate medical attention. They each had the authority and responsibility to make regular and periodic inquiries relative to releasing Shawn Duncan, Sr. from restraints  and to insure that he was not held in restraints beyond what was medically necessary and authorized.  On information and belief, defendant Gates also had supervisory responsibilities, which included but were not limited to responsibility for oversight and co-ordination of the provision of medical and psychiatric services for inmates. Each of these defendants are persons of the full age of majority, are sued in their individual and official capacities and, on information and belief, are residents of the Eastern District of Louisiana.

11.     Defendant Shamata King is an employee of defendant Sheriff Foti who worked as a clerk on the psychiatric wards of the jail at all pertinent times herein. Defendant King had the responsibility to insure that orders and schedules for medical care and treatment of prisoners were properly recorded and transmitted to insure continuity and follow-up of care and implementation of physician's orders and departmental policy. Defendant King had the responsibility to insure that Shawn Duncan, Sr. was scheduled for medical evaluations, including on the morning of August 10, 2001 and that the appropriate medical personnel were informed regarding Mr. Duncan, Sr.'s situation.  Defendant King is a person of the full age of majority, is sued in her individual and official capacity and on information and belief is a resident of the Eastern District of Louisiana.

6

12.     Defendant Sgt. Jerrod Spinney is employed by defendant Foti as a deputy sheriffs and was a supervisor, assigned to the psychiatric units of the Orleans Parish Correctional Facility. At all pertinent times herein he was responsible for communicating reported or obvious medical needs of prisoners including Shawn Duncan, Sr., to medical staff and of properly supervising and overseeing the proper job performance of OPCSO employees under his supervision.  He was responsible for checking on and supervising the condition of Shawn Duncan, Sr. while Mr. Duncan was in restraints.  He was responsible for the supervision and training of defendants Haynes, Carter and Dominici as well as other deputies. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana. He is sued in his official and individual capacity.

13.     Defendant Deputies Terry Haynes, Cynthia Carter and M. Dominici, at all pertinent times herein, were employed by defendant Foti and assigned to the psychiatric units of the Orleans Parish jail. They were each responsible for communicating reported or obvious medical needs of prisoners, including Shawn Duncan, Sr., to medical staff. They were also responsible for conducting and accurately reporting regular, periodic observations of Shawn Duncan, Sr. during the time he was in restraints on the psychiatric ward of the jail and responsible for insuring that he received adequate nutrition, hydration and mobility and medical care.  They are each persons of the full age of majority and, on information and belief, are residents of the Eastern District of Louisiana. They are each sued in their official and individual capacity.

14.     Defendant William Short is employed by defendant Foti as Warden of the House of Detention (HOD) facility of the OPCSO where Shawn Duncan, Sr. was held, who

7

at all pertinent times was responsible for training and supervising OPCSO deputies, including those named as defendants herein, overseeing the security and well-being of prisoners in the custody of the defendant Foti and facilitating communication between prisoners in need of medical care, including Shawn Duncan, Sr., correctional staff and medical staff.  He was also responsible to insure that prisoners being held at the House of Detention (HOD) facility of the OPCSO made court appearances as required by law.  He is a person of the full age of majority and a resident of the Eastern District of Louisiana. He is sued in his official and individual capacity.

## IV. **STATEMENT OF FACTS**

15.     On August 2, 2001, Shawn Duncan, Sr., a 24 year old resident of New Orleans, La., was arrested by officers with the New Orleans Police Department (NOPD) and charged with various traffic offenses, including DWI.  At the time of his arrest, he informed the arresting officer that he had ingested several valiums and Somas and was observed by the arresting officer "to have poor balance (and)... was sweating profusely and shaking".  He was transported to Medical Center of Louisiana at New Orleans (MCLA-NO) where he was treated in the Emergency Room.  He was discharged to the custody of the defendant Sheriff Foti and the Orleans Parish Criminal Sheriff's Office, (OPCSO) with a diagnosis of drug overdose with suicidal ideation. His discharge treatment plan was "Psych followup".

16.     Upon admittance to the custody of the Orleans Parish Criminal Sheriff's Office detention facilities, (hereafter referred to as 'the jail'), Mr. Duncan, Sr. was transferred to the Psychiatric ward, located on the 10th floor of the House of Detention (HOD). He was ordered placed in 4 point restraints at 3:30 A.M., August 3, 2001 by Dr.

Shartha. He was then ordered placed in 5 point restraints at 11:35 a.m. by Defendant Dr. Michael Higgins. Five point restraints involves securing the individual to a bed with straps on his arms and legs and across the waist. When Mr. Duncan, Sr. was in five-point restraints he was unable to care for his most basic human needs, such as eating, drinking, urinating, defecating and movement of his body. He was completely dependent upon the attention and care of correctional and medical staff of the facility during these times to tend to those needs. Prior to ordering him placed in 5 point restraints, defendant Dr. Higgins failed to properly evaluate Mr. Duncan and failed to issue orders regarding checking his vital signs and range of motion and insuring that he received appropriate hydration, nutrition, range of motion and monitoring for the appropriateness of less restrictive alternatives. He remained in 5 point restraints for almost 24 hours and was ordered released from those restraints on August 4, 2001 at 10:20 A.M. During the time he was in restraints he was not provided with adequate hydration, no vital signs were taken or monitored, there were no range of motion exercises conducted, there were no checks for circulation and there were no efforts made to determine whether there were less restrictive alternatives to the 5 point restraints.

17.     On August 6, 2001, Shawn Duncan, Sr. was transferred to the 7th Floor, "step-down" unit of the Psychiatric Ward of the jail. On August 8, he had an acute mental status change, became extremely agitated, was sweating profusely and was involved in an altercation with another prisoner at approximately 8:00 p.m. Prior to this altercation, deputies and medical personnel on duty were advised of Mr. Duncan's appearance and behavior change but failed to respond. After the altercation, and without attempting or considering any less restrictive treatment alternatives and without taking his vital signs,

9

examining, properly reporting or documenting his medical condition, defendant LPN Judy Coleman requested, and defendant Dr. Leszek Michalewicz orally ordered Shawn Duncan, Sr. to be restrained in 5 point restraints for 12 hours. Mr. Duncan, Sr. was not examined by any physician, the oral orders by Dr. Michalewicz were never signed and there was no inquiry or effort made during this 12 hours to determine whether less restrictive alternatives were viable. During this 12 hour period there were no examinations or evaluations for circulation or range of motion, no bathroom "privileges", no vital signs taken,  no fluids given and no checks for any other basic human or medical needs Mr. Duncan might have. From 7:00 a.m. to 8:00 a.m. on August 9, 2001, Shawn Duncan, Sr.  was reportedly "mumbling incoherently" yet there was no medical evaluation or treatment of his condition requested or given by any correctional or medical staff. After issuing his verbal order, defendant Dr. Michalewicz never followed up, never checked on Mr. Duncan or ordered any treatment for any mental or medical condition he might have.

18.    On August 9, 2001 at approximately  9:00 A.M. defendant LPN Judy Coleman, without having made any actual, physical examination, evaluation or monitoring of Shawn Duncan, Sr., without having taken vital signs, or checking him for range of motion, coherence, current state of mind, hydration or any other basic or pertinent medical condition, requested, and Dr. Samuel Gore, who is not a psychiatrist, without seeing Mr. Duncan, Sr. or his medical records and without requesting or considering reasonable and proper medical information regarding his status, ordered  a continuation of Mr. Duncan's restraint in 5 points for another 12 hours. Mr. Duncan, Sr. was not examined by any physician or medically trained personnel,  the oral orders by Dr. Gore were never signed and there was no inquiry or effort made during this 12 hours to determine whether less

10

restrictive measures were viable. For the next approximately 8 ½ hours, while Shawn Duncan, Sr. was in these five point restraints, there were no nursing checks, no range of motion evaluations, no bathroom "privileges", no vital signs taken, no fluids given and no checks for hydration or other basic human and medical needs which he might have. After issuing his verbal order, Dr. Gore never followed up, never checked on Mr. Duncan or ordered any treatment for any mental or medical condition he might have.

19.     On August 9, 2001, at approximately 6 p.m., defendant Dr. Dorota Gawlas interviewed Shawn Duncan, Sr.  Dr. Gawlas did not look at his medical records, take vital signs, check his circulation, conduct any physical examination, order any medical or laboratory tests to determine Mr. Duncan, Sr.'s medical condition nor did she order anyone else to undertake these examinations. She relied upon hearsay and an undocumented report from a deputy that Mr. Duncan had possibly ingested another prisoner's medication 21 hours before, noted that he complained of stiffness and rigidity, and then failed to take reasonable and appropriate steps to determine whether or not Shawn Duncan, Sr. had in fact ingested any non-prescribed medication  and if so, what medication. She failed to review the Observation, Seclusion and Restraint Check List which revealed that Shawn Duncan, Sr. had no bathroom "privileges" and no fluids for the previous 21 hours while restrained and had not been released for range of motion or circulation checks during that time. She diagnosed Shawn Duncan, Sr. as having Psychosis NOS, ordered that an injection of Benadryl 50 mg (an antichlorgenic agent with dehydrating effects) be given, that Shawn Duncan, Sr. be monitored for "stiffness and rigidity", and that he be re-evaluated in the A.M. She ordered the continuation of five point restraints with no time limit specified in her order. There was no effort made by her to attempt or rule out  any less

11

restrictive treatment alternatives.  Dr. Gawlas did not monitor Shawn Duncan, Sr. to see if the Benadryl she prescribed had any effect on him nor did she order the nurses to report to her regarding the effects, if any, of the medication she had ordered. Dr. Gawlas did not give orders to  insure that Mr. Duncan, Sr. receive adequate hydration or range of motion or that he be evaluated for release or less restrictive alternatives during the time he was restrained.  Her physicians' progress note was incomplete and inadequate.

      20.    Pursuant to Dr. Gawlas' order, on August 9, 2001,  Defendant LPN Cheryl Blake gave Shawn Duncan, Sr.  the injection of Benadryl. She failed to note the effect, if any, of this injection on Shawn Duncan, Sr., failed to examine or monitor him for stiffness and rigidity, failed to take his vital signs and check his circulation, failed to see that he received appropriate hydration,  range of motion exercises, and bathroom privileges, failed to make appropriate inquiry or examination of him as to his mental or physical state and failed to  make any investigation or inquiry as to whether he could be released from restraints or whether less restrictive alternatives could be utilized.  Defendant Blake also failed to take reasonable and necessary steps to insure that Shawn Duncan, Sr. would be re-evaluated in the morning of August 10, 2001 as per Dr. Gawlas' order or be released after 12 hours in accordance with OPCSO written policy which provides that "in no instance shall an order (for restraint/seclusion) exceed twelve hours".

      21.    On August 10, 2001, from 7:00 a.m. to 7:45 a.m. Shawn Duncan, Sr. was reportedly "cursing, yelling or screaming". Defendant LPNs Judy Coleman and Robert Gates were on duty at that time, yet failed to properly monitor, examine or intervene in any way to determine his condition or to release him from his restraints although more than12 hours had passed after Dr. Gawlas' order was issued. Defendant Coleman, defendant

12

Shamata King and, on information and belief, defendant Gates, knew that Dr. Gawlas had ordered that Shawn Duncan, Sr. be re-evaluated in the morning of August 10, 2001, yet failed to take reasonable and necessary steps to insure that this re-evaluation occur, though they each had the responsibility to do so.

22.     Around 2:30 p.m., August 10, 2001, Defendant LPNs Shawn Viverette and Cheryl Blake came on duty on the 10th floor, HOD. They each failed to check on Shawn Duncan, Sr., failed to monitor or evaluate his condition, and failed to seek medical attention for him or release him from restraints.

23.     During the time he was restrained in 5 point restraints, defendant deputies Haynes, Carter and Dominici, as well as other deputies, were responsible for maintaining constant, periodic checks of Mr. Duncan, Sr.'s condition every fifteen minutes and recording the results of those observations.  Defendants Haynes, Carter and Dominici failed to perform their duties and prepared false documents to make it appear that Mr. Duncan, Sr. was in fact being monitored every fifteen minutes, with contemporaneous record-keeping, and that he was regularly eating food. Defendants Haynes, Carter and Dominici and other deputies failed to seek medical attention for Mr. Duncan, Sr., failed to see that he frequently and regularly received liquids and bathroom "privileges", failed to insure that he was frequently and regularly released from restraints so as to permit him to move about, and failed to accurately or reasonably record the actual condition of Mr. Duncan, Sr. Furthermore, these defendants failed to respond when Mr. Duncan was screaming or mumbling incoherently, to inquire as to the cause of his distress or to seek medical attention for him. They  improperly delegated the responsibility of monitoring Mr. Duncan, Sr. to another inmate, the tier representative, who was not medically trained and

13

who was an inappropriate agent for this purpose.

24.    Shawn Duncan, Sr. remained in 5 point restraints, unable to move, unable to obtain water, unable to obtain medical assistance until 3:45 p.m. on August 10, 2001 when he was discovered in his cell by the inmate tier representative, pulse-less, apneic, with fixed pupils. By that time he had been in 5 point restraints for over 42 hours. During that time there is only one log entry that he had been served and taken fluids, which is on August 10, 2001 at 5:30 a.m. During the entire 42 hours he was in five-point restraints, none of the defendants took any action to insure that vital signs were taken or that his circulation and range of motion was checked; there were no efforts made to enable him to contract for his release from restraints, no efforts were made to attempt  less restrictive alternatives, no evaluation or monitoring as per Dr. Gawlas' order ever took place and no monitoring for hydration, nutritional and mobility needs or for any possible reaction to the medication he was given ever occurred.  There was no treatment plan for Shawn Duncan, Sr.  Pursuant to OPCSO written policy, defendants had the authority and obligation to release Shawn Duncan, Sr. from restraints 12 hours after Dr. Gawlas' restraint order was issued, yet failed to do so. At no time did the defendant LPNs provide or seek medical attention for Mr. Duncan, Sr. other than the injection of Benadryl on August 9, 2001. Similarly, defendant deputies failed to seek medical attention for Mr. Duncan, Sr. for the 42 hours he was in 5 point restraints.

25.    Shawn Duncan, Sr. was declared dead at Charity Hospital on August 10, 2002. The cause of death was dehydration. At autopsy he was described as gaunt in appearance, with his abdomen and eyeballs sunken in. His weight was recorded as 158 pounds. The physical examination conducted of him at the jail on August 7, 2001 by

14

trained medical personnel three days prior to his death, recorded his weight as 178 pounds. At autopsy he had less than 1 cc of urine in his bladder; his stomach contained runny bile-stained material, while his intestines held only scant gastrointestinal material. The only drug in his system was Benadryl.

26.   From August 8-10th, 2001, defendant Dr. Higgins was absent from his duties at the jail, having taken leave. He failed to make reasonable or adequate arrangements for psychiatric coverage during his absence, and abandoned his patient Shawn Duncan, Sr. and the other prisoners who were in restraints, leaving them without adequate or necessary medical attention during his absence. Defendant Dr. Inglese was aware of Dr. Higgins' absence yet failed to take necessary or appropriate steps to insure that there was adequate coverage for psychiatric patients or to insure that morning sick call for those patients took place, resulting in a number of patients, including Mr. Duncan, being left in restraints, without appropriate medical or psychiatric evaluation or treatment. Defendant Dr. Inglese was "on-call" during Dr. Higgins' absence yet failed to make proper inquiry or respond to the medical or psychiatric needs of Shawn Duncan, Sr. during this time or conduct sick call in Dr. Higgins' absence. On information and belief, Dr. Gore also was aware of Dr. Higgins' absence but failed to make proper inquiry or respond to Mr. Duncan's need for medical or psychiatric care. Defendant Dr. Osofsky was also responsible to insure that there was adequate staffing to cover for Dr. Higgins' absence from the jail and failed to do so.

27.   Defendant Sgt. Jerrod Spinney was the supervisor of defendants Haynes, Carter and Dominici, as well as other deputies involved with Mr. Duncan, and was responsible to properly train and supervise them and also was responsible to insure that

Shawn Duncan, Sr.'s condition was monitored and that he received reasonable and adequate care relative to range of motion and hydration and nutrition while in restraints. He knew that Mr. Duncan should have been released at least every two hours for range of motion and bathroom "privileges", yet he failed to do this or to insure that other deputies did so. Sgt. Spinney had the obligation to request medical assistance for Mr. Duncan, Sr. yet failed to do so and failed to require deputies under his supervision to do so.

28.     Defendant Director of Nursing (DON) Paul Thomas was the supervisor of defendants Coleman, Blake, Gates and Viverette and was responsible to properly train and supervise them and to insure that there was proper monitoring of Shawn Duncan, Sr.'s condition and that he received appropriate medical and nursing care, which he failed to do.

29.     Defendants Inglese, Higgins and Osofsky are responsible for the hiring, training and supervision of defendant medical personnel and are responsible for the policies, procedures and customs of the medical and psychiatric departments of the Orleans Parish Criminal Sheriff's Office.

30.     Defendants Dr. Inglese, Dr. Higgins, Dr. Osofsky, and DON Paul Thomas were all persons with the responsibility and duty for oversight, review, monitoring, supervision and evaluation of Shawn Duncan, Sr.'s medical needs and the policies and procedures governing his treatment.  On information and belief, each of these defendants was also responsible for the training and supervision of defendants Cheryl Blake, Shawn Viverette, Robert Gates and Judy Coleman. They were also responsible for receiving and reviewing daily reports of those persons placed in restraints.

31.     Defendants Warden William Short, Sgt. Jerrod Spinney and Deputies T. Haynes, C. Carter and M. Dominici are each persons who had the responsibility and duty

16

to monitor Shawn Duncan, Sr. while he was in restraints, insure that he received adequate nutrition, hydration and mobility, and to communicate his medical needs to the appropriate medical staff for treatment. They each failed to do so.

32.     The failure of defendants to provide and make available reasonable and necessary medical attention and treatment resulted in the death of Shawn Duncan, Sr. and caused him to endure terrible physical and mental suffering prior to his death. Mr. Duncan, Sr. was placed in a totally helpless position where he was completely dependent upon defendants for his most basic human needs, yet these defendants failed to provide appropriate or necessary care for him.

33.     There was no reasonable justification, medical or otherwise, for the extent, duration and manner in which Shawn Duncan, Sr. was placed in 5 point restraints and deprived of basic human needs for water, food, mobility and the elimination of bodily waste. These actions resulted in denying to him the minimal civilized measure of life's necessities, resulting in an agonizing, torturous and cruel death. The placing of him in these restraints in this manner and then continuing to deprive him of water, food, personal hygiene, sanitary facilities for elimination of bodily waste and mobility, served no reasonable purpose, medical or otherwise and constituted cruel, barbaric and inhumane punishment.

34.     Defendants Sheriff Foti, Osofsky, Higgins, Inglese and Thomas knew that the policies and procedures of the jail for providing medical services and treatment of psychiatric patients, including the placing and monitoring of persons in restraints, were inadequate and posed a danger to the serious medical and psychiatric needs of prisoners so confined, yet they failed to take appropriate or necessary steps to correct them. Their

17

actions were reckless, willful, wanton and malicious.

35.    Defendants Sheriff Foti, Dr. Inglese, Dr. Higgins, Dr. Osofsky and DON Paul Thomas were aware of the serious inadequacies of the medical and psychiatric program at the correctional facilities of the OPCSO and had the obligation and ability to correct these deficiencies but failed to do so. Their actions were reckless, willful, wanton and malicious.

36.    At the time of Shawn Duncan's detention and death, Defendant Osofsky was a signatory on a contract entered into between his employer, LSU and defendant Foti, wherein defendant Osofsky and other LSU Medical School personnel under his selection, direction and supervision, would provide psychiatric services to prisoners at the jail and maintain and improve policies, procedures and standards for treatment, in exchange for an annual fee of $211,751. Defendants Osofsky and Higgins were responsible for the staffing, training and supervision of physicians in providing those professional services and were responsible for insuring that these physicians provided services consistent with accepted medical standards as well as those of the OPCSO. In the event that policies and procedures of the OPCSO deviated from accepted medical standards, defendants Osofsky and Higgins had the obligation to insure that those policies were changed.

37.    At the same time defendant Osofsky undertook the obligations of the LSU contract with defendant Foti, he was serving as a paid, court-appointed expert (receiving $4,000 a month, through the federal court) in on-going federal court litigation involving a plaintiff class which included persons in the custody of defendant Foti, such as Shawn Duncan, Sr., who alleged that their rights to reasonable medical and psychiatric care for serious medical needs, were being violated by defendant Foti and the medical department

18

at the jail. In his capacity as court-appointed expert, defendant Osofsky was required to function as a neutral and objective expert, not aligned with any of the parties in the litigation and was to monitor the operations of the jail's psychiatric treatment program and its staff, including Dr. Higgins and the defendants herein. Defendant Foti knew of Dr. Osofsky's position as court-appointed expert, yet defendants Osofsky and Foti entered into this contract, knowing that doing so would compromise defendant Osofsky's neutrality and objectivity and would create a conflict of interest which would interfere with the significant interests of prisoners at the jail, including Shawn Duncan, Sr., in having meaningful and objective oversight of the jail's policies, procedures and practices to insure that they comported with constitutional standards of care. These actions by defendants Foti and Osofsky were reckless, wilful, wanton and malicious.

38.      Shawn Duncan, Sr., was arrested on August 2, 2001 without a warrant and he died on August 10, 2001, 8 days later, still in the custody of defendant Sheriff Foti,  without ever having appeared before an impartial magistrate to determine probable cause or  the appointment of counsel and review of his bail.

39.      Defendant Sheriff Foti had the duty, power and responsibility to establish and maintain proper policies, procedures and practices to insure that Shawn Duncan Sr. and other detainees similarly situated would appear before an impartial magistrate within 48 hours of a  warrant-less arrest to determine probable cause and within 72 hours of arrest for appointment of counsel and review of bail, yet he failed to do so. Having failed to produce Mr. Duncan for his initial court appearance, defendant Foti was then obligated to release him from custody, which he failed to do.

40.      Other persons similarly situated to Mr. Duncan, who were arrested on

19

charges without a warrant and were  in the custody of the defendant Foti and OPCSO, were brought before an impartial magistrate within 48 hours of their arrest. There was no compelling reason to justify the denial of this fundamental right to Mr. Duncan.

41.     During the time he was in the custody of defendant Foti, Shawn Duncan, Sr. was prevented from using  the telephone or making contact with his family, an attorney or the court, in order to seek his release from confinement or to make known the extremely harsh and punitive conditions in which he was being detained. None of the defendants made any reasonable attempt to contact his family, an attorney or the court on his behalf during the duration of this ordeal or to provide any assistance to him to be able to do so.

## V. **FIRST CAUSE OF ACTION**

42.     Plaintiffs repeat and re-allege each and every allegation of the complaint.

43.     The defendants, acting individually and together, and under the color of law, engaged in a course of conduct and conspired to engage in a course of conduct which acted to deprive Shawn Duncan,  Sr. of his constitutional rights and did deprive him of said rights, specifically, the right of Shawn Duncan, Sr. to reasonable and necessary medical treatment, the right to be free from cruel and unusual punishment, the right to be free from unreasonable search and seizures, the right of access to the courts, counsel and bail, and the right to due process and equal protection of the laws as protected by the First, Fourth, Sixth, Eighth and Fourteenth Amendments and Article IV (Privileges and Immunities Clause) of the United States Constitution and 42 U.S.C. 1983.

44.     At all times pertinent herein the defendants, acting individually and collectively, acted unreasonably, recklessly and with deliberate indifference and disregard

20

for the constitutional and civil rights and life and serious medical needs of the deceased, Shawn Duncan, Sr.

45.     Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of Shawn Duncan, deceased, described herein, and the suffering and torment he was subjected to, but failed to do so.

46.     Plaintiffs further allege that such acts as alleged herein were the proximate cause and cause in fact of the death of Shawn Duncan, Sr., the injuries he suffered and the damages inflicted upon plaintiffs.

## VI. SECOND CAUSE OF ACTION

47.     Plaintiffs repeat and re-allege each and every allegation of the complaint.

48.     Defendants Sheriff Foti, Dr. Inglese, Dr. Higgins, Dr. Osofsky and DON Paul Thomas, acting individually and collectively, established, condoned and encouraged customs, policies, patterns and practices which directly and proximately caused the deprivation of the civil and constitutional rights of the deceased as alleged herein, and the damages and injuries as described.

49.     These written and unwritten policies, customs and practices included, among others:

>   1.     Inadequate, improper and unreasonable treatment, monitoring and supervision of serious medical and psychiatric needs for persons in custody.
>
>   2.     Inadequate and unreasonable sick call and referral procedures relative to the serious medical and psychiatric needs of persons in custody.
>
>   3.     Inadequate and unreasonable follow-up and on-site medical and psychiatric staffing and coverage.

21

4.      Hiring of inadequately trained and inexperienced persons to render medical and psychiatric treatment to persons in custody.

5.      Inadequate training, supervision and discipline of medical personnel responsible for furnishing medical and psychiatric treatment and services to persons in custody.

6.      Inadequate hiring, training, supervision and discipline of deputies and supervisors in the observation and monitoring of prisoners in restraints and the communication of serious medical needs of persons in custody to appropriate medical personnel.

7.      A pattern and practice of deputies and medical personnel ignoring prisoners' requests and needs for medical and/or psychiatric attention so that prisoners serious medical needs are frequently ignored and, in those instances where medical and/or psychiatric treatment is ultimately obtained, it is often unreasonably delayed and inadequate to the medical and psychiatric needs of the prisoners, causing serious pain, suffering, and frequently, permanent injury and/or death.

8.      Inadequate and unacceptable policies, procedures and practices relating to placing persons in restraints, including but not limited to the following:

        a.      Failing to require that less restrictive alternatives other than restraints be seriously considered or utilized before resorting to the use of restraints.

        b.      Failing to insure that restraints, once applied, are not used for any periods of time longer than are medically necessary or justifiable.

        c.      Failing to require regular and frequent re-assessment of restrained prisoners for less restrictive alternatives to restraints.

        d.      Failing to require regular, frequent and documented evaluations of persons in restraints by nurses or qualified medically trained personnel which include but are not limited to taking vital signs, conducting assessments as to providing release from restraints, checking for range of motion, releasing restraints to allow for exercise, closely monitoring nutrition and hydration, including intake and output, personal hygiene and sanitary needs, toilet access, and other

fundamental human needs.

e.   Failing to require that restraint policies, procedures and practices in the jail comport with those which are medically accepted standards in the community.

f.   Inadequate training of deputies who are required to observe and monitor those in restraints and record their observations.

g.   Allowing inmates to participate in the monitoring and to have access to inmates who are in restraints, including providing and controlling food and water and bathroom access.

h.   Allowing persons to be held in restraints for unreasonable periods of time without requiring physical and psychiatric examination by medically trained personnel.

i.   Permitting and condoning significant violations by medical and security personnel of written policies and procedures regarding medical and psychiatric care of persons in restraints, resulting in significant discrepancies between written policies and procedures and actual practice and custom, with no meaningful discipline, consequence or accountability for said violations or discrepancies, to the detriment of the health, safety and welfare of the prisoners in their care.

j.   Inadequate supervision, monitoring and training of "moonlighting" physicians and residents;

k.   Inadequate review or quality control of restraint orders and procedures to insure that they are being properly issued, applied and monitored.

l.   Inadequate record keeping of restraint observation sheets of individuals who are restrained by failing to make these reports an integral part of the individual's medical records and failing to require frequent, regular review of these documents by medically trained personnel.

m.   Failing to provide adequate staffing for monitoring,

evaluating and treating prisoners in restraints.

n.    Improper use of restraints as punishment and discipline.

o.    Allowing medical personnel to prepare inadequate progress notes and records regarding the condition of prisoners in restraints, without appropriate discipline or accountability.

p.    Denial of access to water, food, exercise, bathing and toilet facilities and placing prisoners in restraints in vulnerable positions relative to other prisoners.

9.    Inadequate, deficient or non-existent treatment plans for patients receiving psychiatric services.

10.   Inadequate quality control policies, procedures and practices, inadequate critical incident review and inadequate identification and correction of serious deficiencies in policy and practices affecting the delivery and quality of medical and psychiatric services.

11.   Inadequate policies and procedures for insuring that persons in custody charged with traffic offenses in Orleans Parish would appear before an impartial magistrate within 48 hours of arrest for a prompt judicial determination of probable cause.

50.    In addition to the injuries sustained by plaintiffs herein, the deliberate indifference of defendants Foti and Inglese to the serious  medical needs of prisoners in their custody has resulted in numerous instances of other prisoners sustaining serious and oftentimes fatal injuries and illnesses, including but not limited to:

1.    Joanne Johnson. Died April, 1999 of diabetic ketoacidosis due to failure to receive proper insulin dosage and monitoring while in custody.

2.    Keiwine Warren. Died August, 1998 from a massive infection caused by an untreated, perforated ulcer. Despite more than 4 days of begging to see a physician, Mr. Warren was not seen by a doctor until he collapsed in his cell and stopped breathing. The LPN who saw him several hours before his collapse failed to take his vital signs, which would have revealed his serious medical condition and need for

24

immediate treatment.

3.      Ruth Ann Milazzo. Died Nov. 1996 of diabetic ketoacidosis due to failure to receive proper insulin dosage and medical care while in custody.

4.      Katherine Hoard. Died 1992. Medically fragile patient with serious illnesses accepted to the jail instead of referring to the hospital and after admitted to jail was denied essential medication.

5.      Giselle Jenkins, July, 1998. Had seizures, resulting in permanent paralysis as a result of being denied proper medication and medical treatment while in custody.

6.      Mark McAdams. 1992-93. Suffered ruptured appendix and nearly died due to failure of medical or correctional personnel to respond to numerous requests for proper treatment.

51.     The drug distribution policies and practices of the defendants result in many mentally ill prisoners not being properly monitored for taking of their medications and the hoarding and trafficking of drugs inside the psychiatric wards, to the serious detriment of the mental and physical health of the patients.

52.     At all times pertinent herein the defendants Sheriff Foti, Inglese, Higgins, Osofsky, Thomas and Gawlas acted unreasonably and with deliberate indifference and disregard for the constitutional and civil rights and life and safety of the deceased, Shawn Duncan, Sr. The actions of these defendants were malicious, wilful, wanton and reckless.

53.     Plaintiffs further allege that such acts as alleged herein were the proximate cause and cause in fact of the death of Shawn Duncan, Sr. and the injuries suffered by plaintiffs.

## VII. THIRD CAUSE OF ACTION

54.     Plaintiffs repeat and re-allege each and every allegation of the complaint.

55.     The pendant jurisdiction of the Court is invoked for all claims under state law.

56.     At all times described herein, the defendants, individually and collectively, acted negligently, with gross negligence and/or intentionally in denying reasonable and necessary medical care to Shawn Duncan, Sr., and in inflicting physical injury and severe emotional, mental and physical pain and suffering upon him, in violation of Louisiana constitutional and statutory law.

57.     The actions of the defendants caused the wrongful death of Shawn Duncan, Sr.

58.     At all pertinent times the defendant employees of the OPCSO were acting in the course and scope of their employment and the defendant Sheriff Foti is vicariously liable for the injuries and damages incurred herein as a result of their actions.

59.     The defendants Dr. Inglese, Dr. Higgins, Dr. Michalewicz, Dr. Gore, Dr. Gawlas, Dr. Osofsky, DON Paul Thomas, LPN Blake, LPN Coleman, LPN Viverette, and LPN Gates each acted in derogation of their duties as medical professionals and their treatment of Shawn Duncan, Sr. was beneath the standard of care in the community.

60.     The defendants, Sheriff Foti, Dr. Inglese, Dr. Higgins, Dr. Osofsky, and DON Paul Thomas are liable for the wrongs complained of herein by virtue of encouraging, aiding, abetting, counseling and condoning the commission of the afore described acts, by their failure to properly administer, organize and staff the medical program and for the failure to properly screen, hire, train, supervise and discipline persons under their supervision and control whose acts and omissions contributed to the death of Shawn Duncan, Sr.

61.     Defendant Foti and OPSCO employees acting in the course and scope of their employment and for whom defendant Foti is vicariously liable, acted in violation of

26

Louisiana Code of Criminal Procedure Art. 230.1 and 230.2 and the Louisiana Constitution's guarantees of the rights to due process, equal protection, access to the courts, counsel and bail and the right to be free from unreasonable search and seizure, in failing to promptly bring Shawn Duncan, Sr. before an impartial magistrate for a probable cause determination within 48 hours of his arrest and for appointment of counsel and review of his bail within 72 hours of his arrest. After failing to produce Mr. Duncan for his first court appearance, he then failed to release him from custody, as required by law, resulting in the false arrest and imprisonment of Mr. Duncan.

62.    The defendants are liable individually, jointly and in solido for their actions as alleged herein.

63.    Plaintiffs further allege that the above described actions were the proximate cause and cause in fact of the injuries sustained herein.

## VIII. DAMAGES

64.    As a result of the actions of the defendants as described above, damages have been incurred as follows:

1.    Shawn Duncan, Sr. (deceased) suffered conscious and severe physical, mental and emotional distress, pain and suffering prior to death and lost his life.

2.    Shawn Duncan, Jr. and Dezero Bryant, the minor children of Shawn Duncan Sr., each suffered emotional pain and suffering, past, present and future, loss of support, and have suffered the loss of love, affection , companionship, and guidance of their father, Shawn Duncan, Sr.

3.    Funeral and burial expenses in excess of $6,000 have been incurred by plaintiffs.

27

4.

## IX.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that after due proceedings there be judgment rendered herein in plaintiffs' favor and against all defendants individually, severally, jointly, and in solido as follows:

1.   Compensatory damages as prayed for herein;

2.   Punitive damages against defendants Sheriff Foti, Dr. Inglese, Dr. Higgins, Dr. Osofsky, Dr. Gawlas and DON Thomas;

3.   Reasonable attorneys fees, all costs of these proceedings and legal interest;

4.   That this matter be tried by jury; and

5.   All other relief that this Honorable Court deems just and proper.

Respectfully submitted,

MARY E. HOWELL, #7030
316 S. Dorgenois Street
New Orleans, LA 70119
(504) 822-4455
Attorney for Plaintiffs

SDuncan:     Complaint.Final

28