

OK-2030

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNIESA WILSON, | * | |
| on behalf of the minor child, | * | CIVIL ACTION NO. 02-2244 |
| SHAWN DUNCAN, JR., TIGA | * | |
| BRYANT, on behalf of the minor | * | SECTION "R" |
| child, DEZERO BRYANT and | * | |
| HANNAH McKENZIE | * | JUDGE SARAH S. VANCE |
| | * | |
| VERSUS | * | DIVISION (1) |
| | * | |
| SHERIFF CHARLES C. FOTI, et al | * | MAGISTRATE SALLY SHUSHAN |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM IN OPPOSITION TO MOTION TO COMPEL

**COMES NOW**, through undersigned counsel, defendant, Dr. Richard Inglese, who objects or opposes plaintiff's efforts to obtain testimony and documents regarding certain procedures conducted at the Orleans Parish Criminal Sheriff's Office ("OPCSO") and ask that this Honorable Court deny plaintiff's Motion to Compel such documents and testimony.

### A. FACTS

The decedent in this matter, Shawn Duncan, was an inmate at the Orleans Parish Prison. Dr. Inglese is the Medical Director for the OPCSO. While a prisoner at the Orleans Parish Prison, Mr. Duncan was under psychiatric evaluation in the psychiatric ward of the prison hospital. During his stay on the ward, he was periodically placed in restraints due to the threat



that he posed to himself as well as the other inmates. On August 10, 2001, an inmate found Mr. Duncan unresponsive in his cell. Attempts to resuscitate him were unsuccessful, and he was pronounced dead at the Medical Center of Louisiana.

Following Mr. Duncan's death the Quality Improvement Committee met and put together a mortality review. A mortality review is a quality improvement investigation where members of the committee sit and discuss quality control issues related to medical care, infection control, mortality review, patient monitoring for the purpose of improving the delivery of health care services.

Plaintiff, in his Motion to Compel, has requested that the Court compel Dr. Richard Inglese to provide deposition testimony and documents regarding the mortality reviews and reports of other inmate deaths, that are unrelated to Shawn Duncan during his tenure as medical director from November 2000, through present. However, Dr. Inglese contends that the information requested by plaintiff is privileged, and as such, the information is not discoverable.

### B. LAW AND ARGUMENT

Louisiana Code of Civil Procedure Articles 1422 thru 1425 define the scope of permissible discovery. La. C.C.P. Art. 1422 permits discovery of all matters **not privileged** relevant to the subject matter of the action. *Hodges v. Southern Farm Bureau Casualty Insurance Co.*, 433 So.2d 125, 129 (La. 1983). It is not grounds for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Generally speaking, the party seeking an order to compel discovery has the burden of proving that the discovery sought is within the scope of La. C.C.P. Art. 1422. *Fore v. Wal- Mart*

*Stores, Inc.*, 5190 So.2d 366 (La. App. 2nd Cir. 1988). A trial court has broad discretion in the handling of discovery matters. *Laburre v. East Jefferson General Hospital*, 555 So.2d 1281 (La.1990).

1. **The information sought by plaintiff is protected by the peer review privilege.**

In accordance with Louisiana Revised Statute 13715.3, the information sought by the plaintiff is protected as peer review committee records, which are considered confidential. La. R.S. 13:3715.3 holds, impertinent part:

> All records, notes, data, studies, analysis, exhibits, and proceedings of any public hospital committee, medical organization, peer review committee, public hospital board while conducting peer reviews, any committee determining a root cause analysis of a sentinel event, any hospital committee, shall be confidential, wherever located and shall be used by such committee and the members thereof only in the exercise in the proper functions of the committee **and shall not be available for discovery** except in proceedings affecting the hospital staff privileges of a physician dentist, psychologist . . . .*[Emphasis added]*.

The information sought to be discovered by plaintiff falls within the purview of is statute and is, therefore, privileged and undiscoverable.

In his deposition Dr. Inglese testified that the Quality Improvement Committee, which is a peer review committee, meets and performs an internal audit, with the goal of finding methods of improving the of health care. Specifically he states in his deposition:

> Q. Have you participated in any internal investigation of this matter, either peer review, or other internal investigation, either at the Sheriff's office or at Tulane?
>
> A. Well, the mortality review is a quality improvement investigation where we sit and we discuss, you know, were standards of care met, was there anything we could identify for the improvement in the future. We have a quality improvement mortality review of all inmate deaths which

-3-

> you actually have copies of . . . . *[Exhibit 1, Deposition of Richard Inglese, page 19, line 2 through line 13].*

The quality improvement committee is definitely a peer review committee as it is a committee determining a root cause analysis of the event which falls right in line with the language of the statute.

Plaintiffs are attempting to dissuade the court from applying the privilege by arguing that the documents that they seek are not protected because they were presented to other parties that were outside of the peer review committee. In other words, any attempt to implement the committee's findings by discussing them with key administrative personnel constitutes a waiver. Plaintiff points to the fact that there are quarterly administrative meetings held during which significant administrative events, which include findings from mortality reviews, are presented. The plaintiff will point out that some of the parties who attend these meetings include the director of operations, the wardens from each building and the chiefs of the departments, none of whom are medical personnel, nor or they members of the quality improvement committee.

> Q. Have you ever had a person from security be one of the people participating on the committee with the Mortality Review Committee?
>
> A. Not on the Mortality Review Committee, but we have a quarterly administrative meeting where we present all findings from significant administrative events which would include significant findings for mortality reviews, and the heads of all security are there as well.
>
> Q. Are there minutes made of those meetings?
>
> A. Yes, there are.
>
> Q. And what were those meetings called, quarterly meetings?
>
> A. They are called administrative meetings.

> Q. Okay, so these meetings are where you discuss these mortality reviews, there-in addition to people from the medical department, there are people from administration, and people from security? Is that correct?
>
> A. Right.
>
> Q. Was the administration, nursing alright?
>
> A. Alright. Medical, infection control, quality improvement, the wardens.
>
> Q. Alright, and a number of people are not medical personnel–
>
> A. Correct. *[Exhibit 1]*

Plaintiffs site no authority to support their argument. Nowhere in the statute does it state that findings of the peer review committee cannot be utilized in staff development conferences. In fact, if information relevant to quality improvement could not be discussed, in pertinent part, with key staff members, improvement in the delivery of health care services could not be implemented. It would seem that this is exactly what it would be used for. Therefore, even though some findings of the mortality review are presented at quarterly meetings, this information is still subject to the protections and limitations of the statute. These statutory protections are required to foster the flow of ideas and solutions to problems among hospital personnel without fear that their peer reviews will be discovered and used against them in future litigation. Compelling disclosure of this information will have a chilling effect on the quality of health care at the OPCSO.

2. **<u>Documents subject to the privilege even as a public record.</u>**

According to the La. R.S. 44:7, the information being sought by the plaintiff is also protected, even if the plaintiff attempts to conclude that the information being sought is public record. La. R.S. 44:7 holds in pertinent part:

> A. The charts, records, reports, documents, and other memoranda prepared by physicians, surgeons, psychiatrists, nurses, and employees in the public hospitals of Louisiana, adult or juvenile correctional institutions . . . are exempt from the provisions of this chapter . . . .
>
> B. The records and proceedings . . . (2) of any hospital committee, medical organization, committee, or extended care facility committee established by a private hospital licensed under the provisions of R.S.40:2100 et. seq. shall be confidential and shall be used by such committee and the members thereof only and the exercise of the proper functions of the committee, it shall not be public records and it shall not be available for court subpoena.

Therefore, even if the plaintiff attempts to argue that the information sought was subject to discovery, due to its being public information based upon its disclosure to the non-medical personnel, La. R.S. 44: 7 defeats this argument as well.

The Attorney General rendered an opinion on point with this case. In that matter, the plaintiffs were attempting to obtain copies of reports rendered by physicians for the purpose of use by the Quality Assessment Committee. The Attorney General was of the opinion that patient care evaluations made by physicians for use by Quality Assessment Committees are confidential and not subject to court subpoena. *OP. Atty Gen. No. 92-191, June 9, 1992.*

In this case, plaintiff is attempting to obtain information created by Dr. Inglese and other members of the Quality Improvement Committee. The information sought contains, among other things, information about future improvement relating to care being given at the facility.

Thus, La. R.S. 44:7 and the persuasive rulings by the Attorney General, plaintiff is clearly not entitled to these documents.

3.   **Peer Review Privilege vs. Self Critical Analysis Privilege.**

Plaintiff claims that the privilege asserted is one that is more akin to a self-critical analysis privilege, rather than a peer review privilege. In support of her argument, plaintiff directs the court's attention to case law that rejects the self-critical analysis privilege: *Hawthorn Land v. Occidental Chemical Corp., 2003 WL 21510426 (6/24/03 EDLA); In re: Kaiser Aluminum & Chemical Co., 214 F.3d 586 (5th Cir. 2000); Seveter v. Barnes, 2001 WL 175234 (E.D. La. 2001).* We disagree.

As stated above, Dr. Richard Inglese is asserting the peer review privilege pursuant to La. R.S. 13:3715.3, not the self-critical analysis plaintiff would like this court to believe is privilege to which a specific statutory protection is afforded.

Plaintiff also asserts that Dr. Inglese refused to answer questions regarding the requested information on the basis of peer review privilege. Specifically, plaintiff's counsel requested documents regarding mortality reviews and reports of deaths other than Shawn Duncan which have occurred to prisoners in the custody of the Orleans Parish Criminal Sheriff's Office during Dr. Inglese's tenure from November 2000, to present. In the deposition of Dr. Inglese he indicated that plaintiffs' counsel, already had that information:

> Q.   Have you participated in any internal investigations of this matter, either peer review, or other internal investigations, either at the Sheriff's Office or at Tulane?
>
> A.   We have a quality improvement mortality review of all inmate deaths, which you actually have copies of, which is puzzling to me, because I have sat on the records and credentialing committees of most hospitals and the

> QI committees of many hospitals and I have always found that QY investigations, QY studies, are non-discoverable.
> Exhibit 1, *Page 19, lines 2 through line 19.*

Plaintiffs have already obtained the information that they seek and they are now attempting to expand their reach. In *Smith v. Lincoln General Hospital, et al.,* 605 So.2d 1347, 1348 (La. 1992), the court held that when a plaintiff seeks information relevant to his case that is not information regarding the action taken by a committee or its exchange of honest self critical study but merely factual encounters of otherwise discoverable facts, such information is not protected by any privilege as it does not come within the scope of information entitled to that privilege.

Here, plaintiffs are clearly attempting to obtain information regarding the action taken by the committee, and to a certain extent, a self-study on how to improve on health care services. Therefore, the information sought is privileged. The *Smith* court went on, stating that:

> La. R.S. 13:3715.3 and 44:7B are intended to provide confidentiality to the records and proceedings of hospital committees not insulate from the discovery of certain facts merely because they have come under review of any particular committee.

The court in *Smith* also held that:

> [T]his does not mean that the plaintiff is entitled to the entire study, as such study may contain evidence of policy making, remedial action, the codes of conduct, and self critical analysis which the privilege seeks to protect in order to alter the ability of hospitals to regulate themselves unhindered by outside scrutiny and unconcern about the possible liability ramifications that might bring about.

The *Smith* case is right on point. It clearly states that the plaintiffs are not entitled to documentation that contains evidence of policy making, remedial action, and proposed portions

of conduct. This is precisely what plaintiffs are demanding, in more descriptive terms, this identifies what is contained in the information plaintiffs seek to obtain from Dr. Inglese.

Plaintiffs also claim to seek such information under the smoke screen that information being sought is specifically to question whether the defendants have ever conducted a good faith investigation of incidents related to prisoners' deaths while in the custody of the OPCSO and whether there have been cover-ups relating to alleged civil rights violations of prisoners do not warrant vacating the privilege. "The privilege was designed to allow the hospitals to regulate themselves unhindered by outside scrutiny and concern about the possible liability ramifications their discussions might bring about." *Id. 1348.* Ordering Dr. Inglese to disclose this information would defeat the very purpose of the statute.

## C. CONCLUSION

The plaintiffs are clearly attempting to obtain the information that is not discoverable. The information sought is privileged under La. R.S. 13:3715.3 and 44:7. Accordingly, defendant respectfully requests that plaintiff's motion be denied.

Respectfully submitted:

WEISS & EASON, L.L.P.

_____
GREGORY C. WEISS (#14488)
MICHAEL J. HALL (#28067)
1515 Poydras Street, Suite 1100
New Orleans, LA  70112
Telephone: (504) 528-9192
Facsimile:  (504) 524-5123
Attorneys for Richard D. Inglese, M.D.

## CERTIFICATE OF SERVICE

I hereby certify that I have forwarded a copy of the above and foregoing **Memorandum In Opposition To Motion To Compel**, on all counsel of record, via overnight delivery, hand delivery, facsimile transmission, or United States mail, properly addressed and first class postage prepaid on this **4th day of November, 2003**.

_____
**MICHAEL J. HALL**

[F \Data\GREG\Wilson OK 2030\Pleadings\Mem Op Mot Compel doc]

BY MS. HOWELL:

Q. Okay, and the answer is no.

How many mortality reviews have you conducted since the time you've been Medical Director at the jail?

A. Roughly 12.

Q. Have you ever had a person from security be one of the people participating on the committee with the mortality review committee?

A. Not on the mortality review committee, but we have a quarterly administrative meeting where we present all findings from significant administrative events which would include significant findings for mortality reviews, and the heads of all security are there as well.

Q. Are there minutes made of those minutes?

A. Yes, there are.

Q. And, who keeps those minutes?

A. Maryann Benitez is Medical Administration.

Q. And, what are those meeting called, quarterly meetings?

A. They're call administrative meetings.

Q. And of those 12 mortality reviews which you've done during the time that you've been there, have you ever found that there was a breakdown in medical or practices that needed to be impacted to



patient care or the outcome?

 MR. WIESS:

 Object to the form of the question.

 THE WITNESS:

 I'm also going to ask that these are -- these are mortality reviews that are QI documents, and --

 MR. WEISS:

 Huh-huh.

 THE WITNESS:

 -- and I don't think that I have to release that information.

 MR. WEISS:

 Let me ask you this. Are you asking him for QI information, counsel?

 MS. HOWELL:

 No, not right now. I'm asking him has he ever reported or found that there was a breakdown in medical or security practices that negatively impacted patient care outcome in any of these mortalities that you've looked at --

 THE WITNESS:

 She's asking me --

 MS. HOWELL:

 -- during the time you've been there.

      THE WITNESS:

      -- to disclose the results.

      MR. WEISS:

      Yes, I agree with that. I agree with that.

      THE WITNESS:

      I can answer?

      MR. WEISS:

      No, no. I'll ask him not to -- instruct him not to answer the question.

BY MS. HOWELL:

Q. Okay, doctor, I want to ask you a few questions for that, because we'll probably have to take this up.

      MR. WEISS:

      Okay.

BY MS. HOWELL:

Q. These meetings that you had with Maryann Benitez, is she a physician?

A. N . I'm sorry. She's our Director of Operations.

Q. Okay, and who else attends that meeting?

A. The wardens from each of -- each of the buildings --

Q. Are they physicians?

A. -- that [illegible] of the department .

Q. [illegible]

Q. [illegible] these meetings whether you have [illegible]

mortality reviews, there -- in addition to people from the Medical Department, there's people from administration and people from security? Is that correct.

A. Right.

Q. All right.

A. It's administration, nursing --

Q. All right.

A -- medical, infection control, quality improvement, the wardens.

Q. All right, and a number of people are not medical personnel --

A. Correct.

Q. -- correct?

    MS. HOWELL:

    Are you going to maintain the objection?

    MR. WEISS:

    Absolutely. They don't have to be.

    MS. HOWELL:

    Pardon.

    MR. WEISS:

    They don't have to be under the statute.

    MS. HOWELL:

    All right.

    MR. WEISS: