

**U.S. DISTRICT COURT**
EASTERN DISTRICT OF LOUISIANA

FILED    APR 1 3 2004

**LORETTA G. WHYTE**
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONNIESA WILSON, et al | * | CIVIL ACTION |
| | * | NUMBER: 02-2244 |
| VERSUS | * | SECTION: J |
| SHERIFF CHARLES C. FOTI, ET AL | * | JUDGE: CARL J. BARBIER |
| | * | MAG. 1: SALLY SHUSHAN |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT THEREOF TO DISQUALIFY COUNSEL

NOW INTO COURT, through undersigned counsel, come the plaintiffs herein who file this Motion and Memorandum in Support Thereof To Disqualify Counsel, for the reasons stated herein:

**1.     Background:**

This case involves federal civil rights and state tort claims for damages against a number of defendants[1] who are alleged to be responsible for the suffering and death of Shawn Duncan, a 24 year old man who died of dehydration on August 10, 2001, while tied down for 42 ½ hours in 5 point restraints on the acute psychiatric ward at the Orleans Parish Jail, which was

---

[1]The defendants fall into three separate groups: (1) OPCSO defendants, who include former Sheriff Charles C. Foti, Jr., Acting Sheriff William Hunter and a number of employees of the OPCSO, including a doctor, nurses, guards, a medical clerk and a warden (2) Four individual LSU doctor defendants, hired by OPCSO under contract with LSU and (3) Dr. Richard Inglese, Medical Director, hired by OPCSO under contract with Tulane.

1

___ Fee_____
___ Process_____
X /Dktd  _Caa_
V CtRmDep_____
___ Doc. No._94_

under the administration and operation of then-Sheriff Charles C. Foti, Jr.[2] At the time of Mr.

Duncan's death, then-Sheriff Foti had contracted with the LSU Board of Supervisors, through

the LSU Department of Psychiatry, LSUHSC-NO, headed by defendant Dr. Howard Osofsky, to

provide medical/psychiatric services, staffing, supervision and care for detained persons who

were in need of psychiatric care. Former Sheriff Foti and the LSU doctor defendants involved in

this matter (Drs. Osofsky, Higgins, Gawlas & Michalewicz) have all denied responsibility for the

suffering and death of Shawn Duncan and have all alleged that if there is fault, then someone

other than themselves, i.e.,"not me", is liable. [3] Trial is set for Dec. 6, 2004.

The LSU defendant doctors have all been represented in these proceedings by private

attorneys hired as Special Assistant Attorneys General, under contracts initiated by former

Attorney General Richard Ieyoub and the Office of Risk Management, Division of

_____

[2]In addition to this lawsuit, there are currently pending other related matters: two medical review panels, Donniesa Wilson et al v Dr. Richard D. Inglese, et al, No. 02-MR-052  and Donniesa Wilson et al v Dr. Richard Inglese, et al, PCF #:2002-01474, Donniesa Wilson et al v Dr. Richard D. Inglese, et al, CDC No. 02-12732, and William Hunter  in his Official Capacity as Acting Sheriff of the OPCSO v. Board of Supervisors of LSU, etc. , CDC #04-1407.

[3] In the answer filed in this court on behalf of defendant Foti (See "Eighth Defense"), it is alleged that "Shawn Duncan's death was caused or contributed to by the fault of other individuals or entities for whom these defendants are not legally responsible, which fault, whether parties or non-parties must be apportioned as a matter of law." Similarly, Dr. Osofsky's answer ("Sixth Defense") states that "the alleged damages of plaintiffs were the result of the actions or inactions of persons other than Howard Osofsky, M.D." Similar defenses are raised in the answers of defendant LSU Doctors Higgins, Gawlas, and Michalewicz.  Former Sheriff Foti has not been excluded by any of the LSU doctor defendants as one of those persons to whom those defendants may attempt to attribute fault. Likewise, defendant Foti has not exempted any of the LSU doctor defendants from among those "other individuals" who he alleges bear fault in this matter.

Administration.[4] All OPCSO defendants, including defendant Foti, sued in his individual capacity and William Hunter, named in his official capacity, as Acting Criminal Sheriff for Orleans Parish, are represented by attorney Leonard Levenson.

On January 12, 2004, Charles C. Foti, Jr., defendant and witness in these proceedings, was sworn in as Attorney General of the State of Louisiana. On January 28, 2004, acting OPCSO Sheriff William Hunter filed suit against LSU for contract violations by LSU and its representatives, Drs. Howard Osofsky and Dr. Michael Higgins, which are alleged to have been the cause in fact and legal cause of the death of Shawn Duncan. A copy of that petition is attached as Exhibit A.[5] A copy of the contract which is at issue is attached as Exhibit B. The Hunter v LSU petition also seeks indemnification from LSU in the event that the OPCSO is held liable for the death of Shawn Duncan. At the times of the confection and subsequent alleged violation of the contract by LSU, then Sheriff Foti was the representative acting on behalf of the OPCSO. Dr. Osofsky was a designated signatory for LSU, Department of Psychiatry and Dr.

---

[4]Defendant Dr. Howard Osofsky is represented by Special Assistant Attorneys General John Litchfield and Pat Traina and Carey Daste of the law firm of Berrigan, Litchfield, Schonekas, Mann, Traina & Thompson. Defendant Dr. Michael Higgins is represented by Special Assistant Attorneys General Alan J. Yacoubian and Julianne T. Echols of the firm Johnson, Johnson, Barrios & Yacoubian. Defendants Dr. Gawlas and Dr. Michalewicz are represented by Special Assistant Attorneys General Mark Vezina and Kathi Logan of the firm of Vezina & Gattuso.

[5] Sheriff Hunter was a long-time employee of OPCSO and was named 1st Assistant by defendant Foti shortly before Foti became Attorney General. As such he automatically succeeded to the office of Sheriff. An election is scheduled for the fall. While Sheriff Hunter is the named plaintiff in that CDC lawsuit, former Sheriff Foti is a central and key figure in that litigation for OPCSO. Plaintiffs have also filed an intervention in that lawsuit, as third party beneficiaries of the contract and have added Dr. Osofsky and Dr. Higgins as defendants in that lawsuit for their role in the breach of the contract.

3

Higgins was the LSU psychiatrist hired as the Program Director under the terms of the contract[6]

Shortly after the inauguration of Attorney General Foti, plaintiffs counsel brought to the attention of the Court the obvious problems regarding conflicts in the representation. Plaintiffs interest in this matter is two-fold: (1) to protect any successful plaintiffs verdict from post-trial challenge on the grounds of inadequate representation due to conflicted counsel, <u>Dunton v County of Suffolk</u> 729 F2d 903 (2nd Cir) vacated in part on other grounds 748 F2d 69 (2nd Cir 1984),  <u>U.S. v Schwartz</u> 283 F3d 76 (2nd Cir 2002), <u>Marderosian v Shamshak</u> 170 F.R.D. 335 (D.Mass 1997),  <u>Shadid v Jackson</u> 521 F Supp 87 (E.D.Tex 1981) and (2) the obligation that plaintiffs counsel has as an officer of the Court, a member of the Bar and to the fair and impartial administration of justice. <u>In the matter of Gopman</u> 531 F2d 262 (5th Cir 1976), <u>Mylett v Jeane</u> 910 F2d 296 (5th Cir 1990).

Plaintiffs believe that there are non-consentable conflicts in representation in this case involving former Sheriff, now Attorney General Charles F. Foti, Jr., who is, in this litigation, (1) a named defendant, sued in his individual capacity and against whom punitive damages are being sought under 42 USC 1983, (2) a material witness in this proceeding and other, related proceedings cited herein, involving Shawn Duncan's death, and (3) since being sworn in as

---

[6]One of the issues in dispute in that lawsuit as well as this federal suit involves the assertion by Dr. Osofsky that Sheriff Foti authorized the Director of Psychiatry at the jail,  Dr. Higgins, to leave on vacation August 8-10, 2001, leaving Dr. Richard Inglese in charge in his absence. Sheriff Foti has denied that he ever authorized such an arrangement. He has further testified that he would not have approved such an arrangement, as Dr. Inglese is not a psychiatrist and didn't work for LSU and OPCSO had a contract with LSU to provide a psychiatrist to fill Dr. Higgins' duties in his absence, which it failed to do. It was during Dr. Higgins absence that Shawn Duncan was tied down in restraints and subsequently died. Plaintiffs allege that the failure of Dr. Higgins and Dr. Osofsky to assign a psychiatrist to take care of Dr. Higgins' patient care, clinical and administrative duties while he was gone, contributed to Shawn Duncan's suffering and death. Dr. Osofsky, as head of the Department of Psychiatry at LSU approved Dr. Higgins' absence and the substitution of Dr. Inglese, which is alleged to be a violation of the OPCSO/LSU contract.

Attorney General for the State of Louisiana on January 12, 2004, is responsible for the legal

representation for the LSU doctor defendants in this case, all of whom are sued in their

individual capacity in the federal lawsuit. Three of the four LSU doctor defendants (Drs.

Osofsky, Higgins and Gawlas), are also being sued for punitive damages.

Plaintiffs believe that these conflicts are not waivable and, in the alternative, should the

Court determine that they are waivable, that they have not been properly waived. [7] Plaintiffs

have raised this issue in a timely fashion.

**2.**   **Applicable Law**

As the Fifth Circuit noted in In re American Airlines 972 F2d 605, 610 (5th Cir 1992) reh

and en banc rehearing denied (1992):

> In reviewing a motion to disqualify, 'we consider the motion
> governed by the ethical rules announced by the national
> profession in light of the public interest and the litigants' rights.'

See also In re Dresser Indus. 972 F2d 540, 543 (5th Cir 1992),Green v Administrators of the

Tulane Educational Fund, No. 97-1879, 1998 WL 24424, 2 (E.D.La., 1998): ('The Fifth Circuit

has made clear that '(m)otions to disqualify are substantive motions, affecting the rights of the

parties and are determined by applying standards developed under federal law.')

Although federal courts may adopt state or ABA rules as their ethical standards, whether and

how these rules apply are questions of federal law. Id.

The power of the federal judiciary to determine who practices before it and under what

circumstances, is deeply rooted:

---

[7] The LSU defendant doctors have all signed written statements stating that they (the Doctors) do not believe there is any conflict and if there is, they waive it. See Exhibit C (Dr. Osofsky, letter of Feb. 23, 2004); Exhibit D (Dr. Higgins letter of March 1, 2004) and Exhibit E (Drs. Gawlas and Michalewicz, March 25, 2004). Nothing has been filed by OPCSO under Rule 1.11, La. RPC.

> As a federal court of competent jurisdiction over this case under
> the Civil Rights Act and the Constitution, this Court has both the
> federal statutory and inherent judicial power to resolve who may
> be permitted to appear before it and how appearances before it
> may be conducted (citations omitted). Thus, neither state statutes
> nor state courts can be dispositive of any dispute over
> representation of a party in this federal court case. (citation
> omitted).
>
> <u>US v State of Louisiana</u> 751 F Supp 608 (E.D.La. 1990)

The U. S. District court for the Eastern District of Louisiana has adopted the Rules of Professional Conduct of the Supreme Court of Louisiana for its Rules of Disciplinary Enforcement. LR83.2.10E. The Louisiana Supreme Court has new Rules of Professional Conduct, which went into effect on March 1, 2004.[8]  "Although local ethical rules are certainly relevant to that analysis, they are not dispositive." <u>Crowe v Smith 151 F3d 217</u> (5th Cir 1998). "This court should also take into account the standards of the profession, the public interest and the litigants' rights. *In re Dresser*, 972 F2d at 543. The Fifth Circuit has considered the following factors in the disqualification analysis: whether a conflict has: (1) the appearance of impropriety in general; or (2) a possibility that a specific impropriety will occur; and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." <u>Green,</u> supra, at 2. See also <u>Wooley v Sweeney</u> #Civ A. 3:01CV1331-BF, 2003 WL 21488411 (N.D.Tex 2003). Additionally, disqualification is particularly appropriate when the violations of the ethical rules are of a continuing nature. <u>Wooley,</u> supra at 9.

---

[8] A complete copy of the new rules is available on the website of the Louisiana State Bar Association, <u>www.lsba.org,</u> which also has a redline copy which shows the changes that were made in contrast to the old rules. For purposes of this discussion, and particularly given the fact that a federal court looks to national standards, there do not seem to be any changes in the new rules that are material to the issues in this case.

3.    **Argument**

As a Louisiana attorney, defendant Charles C. Foti, Jr. is bound by the Rules of

Professional Conduct and the standards of professional conduct established by  this Court. In

addition, as Attorney General of the State of Louisiana, he is the 'chief legal officer' of the State,

and, it is submitted, has even a higher duty to avoid any appearance of impropriety, given the

keen public interest in insuring the integrity of the office which he holds and the importance of

his office in setting an example of high ethical standards. Article 4, Section 8, Louisiana

Constitution of 1974.

In the litigation at bar, defendant Foti appears in many different capacities. He is a

defendant with a personal financial interest in the outcome of the case.[9] He is a material, and in

some respects "key" witness on many aspects of this case and related proceedings. He was the

final policymaker and was responsible for the hiring, training, supervision and discipline of his

OPCSO co-defendants in the case.  He confected the contracts with LSU, hiring the LSU doctor

defendants. Presumably, as a co-defendant with shared counsel and common interests,  he

has had access to confidential information involving the other OPCSO defendants. And now, as

of January 12, 2004, by virtue of being sworn in as Attorney General for the State of Louisiana,

he is attorney for the LSU doctor defendants.

It is submitted that the unique circumstances of this case dictate that defendant Foti

cannot, consistent with his ethical duties and the plaintiffs and the public's  interest in a fair,

orderly and just presentation of this case,  represent the LSU doctor defendants in this case. It

is also submitted that the disqualification of defendant Foti is imputed to his office, including the

_____

[9]There are no Louisiana statutes authorizing indemnification of a sheriff for punitive
damages from public funds.

7

Special Assistant Attorneys General assigned to this case, and that those attorneys and their firms must likewise be disqualified from further involvement in this matter. Additionally, it is submitted that the lawyers and law firms, acting as Special Assistant Attorneys General in this case, are also prohibited by ethical considerations from continuing with their representations in this matter, on their own merits and not just vicariously through the disqualification of defendant Foti.[10] In the alternative, should the Court permit consentl by any of these defendants, it is submitted that the waivers presented to date are inadequate.

### 1.   Conflicts of Interest and Lawyer as Witness

Plaintiffs assert that the representation by defendant/Attorney General Foti of the LSU defendants in this case is a violation of Rules 1.7, 1.11 and 3.7 of the Louisiana Rules of Professional Conduct and that the violation of Rule 1.7 is imputed to his office. Rule 1.10. Additionally, the situation presented in this case creates an unacceptable appearance of impropriety, contributes to public scepticism about judicial proceedings and undermines the fair and impartial administration of justice.

Rule 1.7(a)(2) states that a lawyer shall not represent a client if the representation of one of more clients will be materially limited by the lawyer's responsibilities to a third person or by a personal interest of the lawyer. In the instant case, defendant Foti has a personal financial stake in this lawsuit which is adverse to that of his LSU defendant clients. It is in his personal interest to avoid liability and to shift it onto his LSU co-defendants/now clients. He has an

---

[10]It should be noted that defendant Foti did not intentionally create this conflict in representation. By virtue of his election, he has been placed in this position as counsel. However, it should also be noted that defendant Foti did not notify the Court of this potential conflict when it occurred, nor has he taken any steps to recuse himself and his office. The belated assignment of his first assistant, to handle the day to day and strategic decisions in this case, is inadequate for the serious ethical conflicts which are at issue.

interest in escaping punitive damages by pointing to "the doctors" and blaming them for what happened. There is nothing wrong with defendant Foti raising this defense. The problem is that he cannot, consistent with ethical obligations, simultaneously represent the very same people upon whom he is trying to shift the blame for Shawn Duncan's death, and neither can his office.

The problem with defendant Foti representing the LSU doctor defendants becomes even more pronounced when Foti's role as a witness is considered. Rule 3.7, La. RPC governs the lawyer as witness.  In the instant case, not only is defendant Foti a material witness in the case, but, if testimony at trial is consistent with deposition testimony, he will be an adverse witness against his own LSU clients on an important issue, i.e., whose fault is it that there was no psychiatrist on duty at the jail, covering Dr. Higgins' responsibilities, during those critical 42 ½ hours.[11]

Courts have not hesitated to disqualify attorneys, and their entire law firms,  when it became apparent that the attorney was a "key participant" or "key" witness. Lange v Orleans Levee Dist. 1997 WL 668216 at *3 (E.D.La. Oct. 23, 1997), Bellino v Simon, No. 99-2208, 1999 WL 1277535 (E.D.La. 1999), National Tax Credit Partners, LP v Manhattan Ltd Partnership No. 90-372, 1992 WL 31843 (E.D.La. 1992), Guaranty Corp v National Union Fire Insur Co., No. 90-2695, 1993 WL 165690 (E.D.La. 1993). See also Acme Analgesiss Ltd. v. Lemmon Co., 602 F Supp 306 (SDN.Y. 1985).

---

[11]Dr. Gawlas, a moonlighting LSU psychiatric resident, still in training, did appear at the jail and saw Shawn Duncan approximately 22 hours before he died. It was her first day on the job on the acute psych ward at the jail. She had no supervision. She had no medical records. She did no assessment of his physical condition and didn't call for any medical doctor to see him, though there were medical doctors at the jail. She left orders for Shawn Duncan to be re-evaluated in the a.m. Due to Dr. Higgins absence, the regular morning psychiatric sick call was cancelled and no physician ever saw Shawn Duncan again, until after he was already dead, 22 hours later. She has an interest in trying to shift responsibility onto OPCSO employees and their lack of training and supervision, which were responsibilities of defendant Sheriff Foti.

This is especially true in situations where the attorney's testimony is adverse to the client:

> If a lawyer must testify adversely to a client's interest, the client cannot waive the conflict.....Testimony is considered prejudicial under this Rule if it is so adverse to the client's side that the bar or the client might have an interest in discrediting the testimony....
>
> Louisiana courts have held that if an attorney is disqualified under Rule 3.7, his presence as a witness may create a conflict of interest that may be imputed to the firm.
>
> Horaist v Doctor's Hospital of Opelousas 255 F3d 261, 266,268 (5th Cir 2001)

The conflict between the testimony of defendant Foti and defendant Dr. Osofsky regarding the alleged authorization for the absence of Dr. Higgins and coverage for his patients in his absence during the time Shawn Duncan was restrained and died, reveals the untenability of the situation in the case at bar:

> By Ms. Howell:
> Q:   Sheriff, we've had testimony that there existed at one point a completed form..
>
> A.   Huh-huh.
>
> Q.   ...of this Request for Leave slip and that the person who had been designated to accept Dr. Higgins responsibilities while he was on vacation was Dr. Inglese. Do you have any knowledge of that?
>
> A:   Absolutely not.
>
> Q:   And are you surprised to hear that?
>
> Mr. Weiss:
> Objection.
>
> The Witness:
> How would the psychiatrist–I mean, the–that Dr. Inglese was going to take the psychiatrist's place, and one works for Tulane and one works for LSU?

10

By Ms. Howell:

Q:      Would that have satisfied your contract?

A:      No

Q:      Did you understand when you contracted with LSU under this contract and when you paid them this money that you were getting a psychiatrist?

A:      Absolutely.

Q:      And that you were getting a faculty member psychiatrist to fulfill these duties?

A:      I was getting somebody to take care of the Psychiatric Department at Parish Prison 40 hours a week plus add-ons were for night times and for holidays that we had residents coming in who were undergoing training, but providing valuable service plus we had social workers up there.

Q:      Sheriff, we also have received testimony from Dr. Osofsky to the extent that he has testified that you in fact signed this leave and that you approved Dr. Higgins' leaving on vacation during the time in question and that you also approved him leaving his assignments to Dr. Inglese.

A:      Why am I paying him all of this money if I do all of that?

Q:      Do you have any—

A:      Absolutely not.

Q:      All right, and it is your testimony that you did not do that?

A:      To the best of my knowledge, I never did it.

Q.      Okay.

A:      I wouldn't...first of all, Inglese is supposed to be there. Inglese is—if anything happens in the jail at all medically, just like they call me for something else, I call Inglese. Would you check on it, doctor. Did you look at it? You know, he's Medical Director. Psychiatric is psychiatric. You're supposed to be a psychiatrist and I—and I would not approve—if you're saying that he'll take sick call for me one day, you know, any—I guess anybody—but that's medical. That's not my problem. I don't want to get involved in that

11

problem. That's...that's LSU's problem, not mine.

Q:     If you had known beforehand that this was going on, that Higgins
       was going to leave, and rather than having a LSU psychiatrist
       come in and cover for him, that he was going to designate Dr.
       Inglese, would you have approved that?

A:     No.

Mr. Weiss:

       Objection to the form of the question

Ms. Traina:

       I'm going to object also to the form.

                              Deposition of Sheriff Charles C. Foti, Jr.
                              December 15, 2003, p.285-288
                              Deposition - Excerpt attached as Exhibit F


Foti also testified that he was not really involved with the leave slips for the LSU doctor

employees:

By Ms. Howell
       Q:     Okay, and–and was that your understanding that if Dr.
              Higgins wanted to take off anything other than an unscheduled
              illness that he had to have permission to do so?

       A:     From LSU

       Q:     Well, that's what I want to ask you, because if you'd look
              then at this Exhibit

Mr. Levenson:
       46

       Q:     ...46, this is the Attachment C–

       A:     Huh-huh.

       Q:     ...the..the form that we were looking at previously, this...it
              referred to Attachment C, but didn't have it attached. You're
              familiar with this Request for Leave Slip?

       A:     Unh-unh.

                              12

Q:      Is this the first time you've seen that?

A:      No. My lawyer showed it to me the other day.

Q:      Okay, but this is just something you've just recently been informed of?

A:      Yeah. I don't sign that.

Q:      Well, let me ask you about that, because you see in the lower left-hand corner, there's a signature block for you?

A:      That's fine. That's really great. Let me tell you what. I don't care whether he comes to work or don't come to work. That's not our problem. My problem is they have to–LSU has to provide a person there when he's not there, because that's what the contract is for, not with me. It is that they are to provide 40 hours a week. So I don't sign that.

Q:      Have you..

A:      I–I don't really sign the ones for my own office.

Q:      Have you ever signed a Request for Leave for any LSU employee who was a contract employee to you similar to this type of document I'm..

A:      I could have signed one time when I was real aggravated about somebody just kept going away to do...to do something, was constantly leaving us in a lerch (sic). I might have signed one at that time where they asked me, okay, I'll have some coverage, but that would be the only time. Other than that, I don't sign these things, and it's not my...it's not my problem. I...you are the contractor. You are to provide the services. You are to provide the services 40 hours a week.

Q:      And what happens if they're not there for the 40 hours a week? What is your remedy?

A:      Then I call up and get somebody to get there.

Q:      All right. Were you aware that Dr. Higgins was leaving on vacation from August 8th through the 10th?

A:      No

13

Deposition of Charles C. Foti, Dec. 15, 2003
Pages 275-277.

Defendant Foti further testified that "to the best of my knowledge, I've never seen this particular

form before."   Foti Dep., p. 280.

In contrast, Dr. Osofsky testified that the standard procedure was that leave by the LSU

doctors was approved by the Sheriff.  He also testified that there was a Request for Leave form

filled out for Dr. Higgins leave on August 8-10, 2001, although he has been unable to locate it,

and that Sheriff Foti approved Dr. Higgins leave.

By Ms. Howell:

Q:   This is a Department of Psychiatry Non-Classified Personnel
Request for Leave form, is it not?

A:   Yes

Q:   All right, and this provides, as I understand it, that according
to Attachment B, that any time that a–the Program Director,
which would be Dr. Higgins on this form, wishes to take leave
that this Form C has to be filled out and has to be approved by
Sheriff Foti, the Clinical Director and the department head. Is
that correct?

A:   That's correct.

Q:   All right, and in this instance, the department head would be
you, is that correct?

A:   That's correct.

Q:   Did you fill out a form like this for Dr. Higgins..

A:   I did not. He did.

Q:   Let me finish. Let me..did you fill out a form like this for
Dr. Higgins in August of 2001 when he went on vacation?

A:   Dr. Higgins filled out the form. I actually asked for it today so I
could have it brought to you. I have seen it within the past few
months but the problem is my secretary at the time has had
some neurological problems and it can't be located. I assumed

14

Dr. Greenleaf had the original. They don't seem to have a copy. What we have stated in providing various leave time, that the form has to be approved by the Sheriff as you can see..

Q:   Huh-huh.

A:   ...and in that case I would agree to provide the signature for it. In other words, that I will agree to provide leave time within the terms of the contract of LSU employment providing it meets with the approval of the jail.

> Deposition of Howard Osofsky,
> Sept 22, 2003, p. 143-145
> Deposition - Excerpts Ex. G.

Q:   How long before he left on this vacation, do you recall, did Dr. Higgins present the leave request?

A:   That's why I was trying to find the form.

Q:   Do you know?

A:   I honestly don't know. I really don't. My hunch..I don't know. It wouldn't have been very long, but I don't know how long it was.

Q:   Okay. The money that Dr. Higgins..

A:   And, by the way, this is a standard form that is..that is generally filled out by faculty, but for the jail, we've insisted that it be approved by the Sheriff and that people not be taking time off that isn't approved by the Sheriff and Medical Director.

> Deposition of Dr. Howard Osofsky, Sept 22, 2003
> P. 162-3

Q:   Huh-huh.
With regard to the contracts with LSU and the Sheriff's office, we talked about Dr. Higgins, the contract with him the last time we were here and we also talked about the leave application that was attached to that. Have you had any additional success in locating that actual document?

A:   I have not, and..and I apologize because I have seen it in the past and I...I just...neither I or my secretaries have been able to locate it, and Dr. Greenleaf states they don't have it in his records, but

15

there was a leave request where he made a leave request where the covering doctor would have been Dr. Inglese. He had signed out administratively and clinically, and, as you know, the leave request required the Sheriff or the Sheriff designee signature and then my signature, and I..I only do it when it's at that point.

Q:  And you're the last person to sign?

A:  I'm the last person to get it, yes.

Q:  And for the leave that we're talking about in August of 2001 that document when..when it came to you was fully filled out?

A:  That's my remembrance, yes.

Q:  And Sheriff Foti had signed that slip?

A:  I believe so. I will not swear to it. I ...there might be a time when someone come to me and say the Sheriff has approved of it and they..they hand it to me, but I...but I've...I've always requested that they get the Sheriff's signature. Now, is there a time when they...when they've missed doing it, I...I..that may well be.

Q:  And why is it that you've always asked that you get the Sheriff's approval?

A:  That part is that it is a collaboration between two facilities. There's a contract in both directions...I...it also came up at the time when Dr. Reinbold was the Medical Director, because Dr. Reinbold does a considerable number of...

Q:  When he was the Medical Director you're saying?

A:  I'm sorry. The Medical Director for Mental Health.

Q:  Okay.

A:  It's interesting, because at one time, it was questioned would he become the overall Medical Director. That would have had nothing to do with me, but he would do a number of surveys each year for the National Commission on Correctional Health Care and one of the questions , and–and so that I..in..in...as Department Chair, this would have been in my role as Department Chair, not in my role as monitor, that if...first of all, it should have been part of the policy anyway, but that I did want to make sure that any leave was approved by the Sheriff's office. By the way, if

16

...if somehow this wasn't signed by the Sheriff, and my assumption is that it was, the fact that Dr. Inglese was the covering doctor, it would have been a technicality that it would have been signed by the Sheriff.

Q:     Well, Dr. Inglese is not the contracting entity, is he?

A:     No, I...but I'm trying to say that he is the Medical Director and Dr. Higgins would have gone through him.

Q:     But the forms that we have that were presented to us as specifically..

A:     I understand, but I'm...I'm not saying it wasn't signed by the Sheriff. I'm just saying I don't have the form. I'm trying to explain the form could have slipped through.

Q:     But my understanding is that from your previous testimony that you specifically had that signature line put there for Sheriff Fot...

A:     That's correct.

Q:     ...because you wanted to have his knowledge and his approval of this...

A:     That's correct.

Q:     ...and that was part of your regular procedure. Is that correct?

A:     And that's why..one of the things I requested, yes.

Q:     All right, and your appreciation of the leave requested by Dr. Higgins was that that was approved by Sheriff Foti. Is that correct?

A:     Yes, that would be my understanding.

Dep of Howard Osofsky, Nov. 20, 2003, p 68-72.
Deposition -Excerpts, Ex. H.

It is submitted that no reasonably prudent and competent lawyer could look at this case and this testimony and conclude that defendant Foti could represent these LSU doctors in these proceedings. There is a  concurrent conflict of interest between defendant Foti and the LSU

17

doctor defendants, which is not consentable (or waivable).

This isn't a situation of Foti owing an allegiance to a third party which interferes with his ability to represent his clients with complete loyalty to their interests. Foti himself is in an adverse position to his clients, the LSU doctor defendants, given the allegations and defenses in this case and his own personal financial exposure.

In U.S. v Schwartz,283 Fed 76 (2nd Cir 2002) the Court discussed the difference between cases involving consentable and non-consentable conflicts of representation, distinguishing "between those conflicts that implicate the attorney's self-interest and those that implicate the attorney's ethical obligation to someone other than the defendant, noting that the former are "of a different character" than the latter.", at p.96. The court concluded that the dividing line was the point where "no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation" and concluded that a conflict of that type was not waivable.

In addition to defendant Foti's own personal stake in this litigation, as lawyer for the LSU doctors, he would, by necessity, be in the position of arguing adverse positions to his own co-defendants, with whom he has shared counsel, the OPCSO defendants, in the same litigation. The LSU defendants interest is in putting as much blame as possible onto the OPCSO defendants. While Foti may not personally be in the courtroom making those arguments and doing that cross-examination, his proxies are, and they are proceeding in his name, as his Special Assistants. Surely such an arrangement cannot pass the "smell test" for what is acceptable ethical standards for attorneys, and in particular, for the chief legal officer of the state. Foti was not acting as counsel for his fellow OPCSO defendants before he became Attorney General but this situation suggests an appearance of impropriety. As to the OPCSO

18

entity, it may be that this conflict is waivable, under Rule 1.11, although to plaintiffs knowledge, it has not been waived. More problematic is the access defendant Foti has had to confidential communications of the individual OPCSO defendants through their shared attorney.  It seems highly unlikely that defendant Foti could ethically continue with shared counsel with the OPCSO defendants at the same time he is representing the LSU defendants, or that current OPCSO counsel could proceed, given the confidential communications which have already taken place in that representation.

The conflicts in this situation transcend the ordinary, as one of the "clients" whose interests are adverse to the LSU defendants is Foti himself. In fact, the bizarre twist in this case is that Foti the lawyer representing the LSU defendants would be taking adverse positions to Foti the client/defendant and Foti the OPCSO contract representative. Add to that mix Foti the material witness and the impossibility of this arrangement becomes apparent.

### 2.   Imputation of Conflicts of Interest: General Rule

Rule 1.10, La. RPC, provides that when lawyers are associated in a firm, "none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 (concurrent conflicts) or 1.9 (former clients), unless the prohibition is based on a personal interest of the prohibited lawyer and does not represent a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." (Parenthesis added)

The LSU doctor defendants in this case are all represented by private counsel, retained as Special Assistant Attorneys General. Under the provisions of Article 4, Section 8 of the Louisiana Constitution of 1974,  "the assistant attorneys general shall be appointed by the attorney general to serve at his pleasure." Under La. R.S.49:258 "any appointment of private

legal counsel to represent the state or a state agency shall be made by the attorney general

with the concurrence of the commissioner of administration." "No settlement over $25,000.00

per claimant shall be made without the approval of the attorney general's office." La. R.S.

39:1535.  The form for attorney John Litchfield reflects that he was hired to represent both Dr.

Howard Osofsky and the LSU Board of Supervisors in this litigation.[12] See Exhibit I.

Plaintiffs do not yet know the full extent of the relationship between the Special Assistant

Attorneys General and the Attorneys General office.[13] In response to concerns raised about the

conflicts issues in this case, counsel for the LSU defendants filed statements with the court that

"Mr. Nick Gachassin, First Assistant Attorney General, will be the person responsible for the

matter before the court. Mr. Nick Gachassin will run the day to day management of the case as

well as any and all pre-trial litigation, trial and potential settlements."  Under the provisions of

the Louisiana Constitution, the first assistant is authorized to act on behalf of the Attorney

General if the Attorney General is temporarily absent from the state or if the elected position is

---

[12]Due to 11th Amendment constraints, the LSU Board of Supervisors is not a named defendant in this federal litigation, though it is named in the CDC lawsuit. The appointment form of John Litchfield raises an interesting question regarding LSU's interest in this litigation, especially given the fact that OPCSO, through Acting Sheriff Hunter, is now suing LSU in state court. If LSU and the State of Louisiana are the real parties in interest, given the state indemnification statute, La. R.S. 13:5108.1, it may well be that waivers by the individual defendants in this matter, even if permissible ethically, are inadequate and that waivers would also be required from the State of Louisiana and LSU. There are a number of courts which have held that governmental bodies such as municipalities cannot waive concurrent conflicts of interest. Guthrie Aircraft Inc. v Genesee County, New York 597 F Supp 1097 (W.D.N.Y. 1984); In re Advisory Committee on Professional Ethics, Docket No. 18-98 745 A2d 497 (N.J.S.Ct. 2000).

[13]Plaintiffs are pursuing discovery on this issue now and also are filing with the Court a Motion for Evidentiary Hearing in order to insure that the necessary facts are presented. "The Fifth Circuit has stressed that a motion to disqualify is a fact-intensive inquiry. Duncan v Merrill Lynch 646 F2d 1020, 1029 (5th Cir 1981)" Hampton v Daybrook Fisheries, Inc. No. Civ A 01-1913,A, 01-2052, 2001 WL 1444933 (E.D.La. 2001).

vacant. La. Const. Art 4, Sections 16 and 19. On information and belief, Mr. Gachassin is in an appointed position and serves at the pleasure of the Attorney General. Defendants have not presented Mr. Gacchessin's involvement in this case as a "screen" and it is clear that the new reassignment of the case to Mr. Gachassin would not constitute a screen.

The "presumed interplay" among lawyers who practice together is the basis for the imputation rule which requires that an entire firm be disqualified when there is one among them who has an unconsentable conflict. U.S. v Kitchin, 592 F2d 900 (5th Cir 1979). In the current situation, while the Special Assistant Attorney Generals are in private firms, it is clear, by their own submission to the court, that the Attorney General's office is deeply involved and appears to be in a position to call the shots on this case. For purposes of this case, the interweaving of these attorneys and the overriding supervision and control of the case by the Attorney General's office, makes clear that the imputation of the conflict should take place and counsel should be disqualified.[14]

Additionally, while defendant Foti was not serving as counsel for the other OPCSO defendants before becoming Attorney General, he was an attorney during that time, shared counsel with the OPCSO defendants and presumably obtained knowledge of confidential communications affecting those defendants. The Fifth Circuit imposes an irrebutable presumption that "confidences obtained by an individual lawyer will be shared with other

_____

[14] Entire prosecutors offices have been disqualified when there has been a conflict involving the head prosecutor, as distinguished from a deputy. State v Stenger 760 F2d 357 (Wash S.Ct. 1988) State v Tippecanoe County Court 432 N.E.2d 1377 (Ind.S.Ct. 1982) State re Goldsmith v Superior Court of Hancock County 386 N.E.2d 942, 945 (Ind. S Ct 1979) ("We must point out however that a prosecuting attorney exercises authority over and speaks through his deputies. Thus, if the elected prosecutor himself becomes a witness in a case or is otherwise disqualified by reason of having an interest in the outcome, his entire staff of deputies must be recused in order to maintain the integrity of the process of criminal justice.")

members of his firm....The Fifth Circuit has never recognized the possibility of a "Chinese Wall"

to rebut this presumption. Further, disqualification may occur despite evidence that confidences

have not–and are not..likely to be breached." See Hampton v Daybrook Fisheries, Inc. No. 01-

1913, A, 01-2052, 2001 WL 1444933 (E.D.La. 2001). The disqualification of counsel in this

case should be imputed to the entire Attorney General's office.

### 3.    Disqualification of Special Assistant Attorney Generals and their firms

In addition to the imputation basis for disqualification, plaintiffs submit that, as currently

configured, the continued representation in this case by Special Assistant Attorneys Generals

and their firms, for the LSU doctor defendants, presents a veritable minefield on its own merits.

Plaintiffs are very concerned about the very real possibility of a major de-railment in this case, if

not now, then mid-trial or post-trial, when the Special Assistant Attorney Generals representing

the LSU doctor defendants are going to be expected to vigorously, and with undiluted loyalty to

their individual doctor clients, cross-examine their ultimate boss in this case, Attorney General

Charles C. Foti, Jr.[15] On information and belief, the three LSU defense firms involved in this

case all have had significant contracts with the state in the past and, on information and belief,

would hope to have them in the future. The person who makes that ultimate decision is the

Attorney General.  This kind of personal financial interest of the attorneys was fatal to the

conviction in Schwartz.

And what happens if the LSU doctor defendants are found liable for punitive damages

and/or individual damages that exceeds the cap and the state legislature refuses to pay? La.

R.S.13:5108.1. It is not difficult to imagine an appeal, most probably by new counsel, that

---

[15]"Under Fifth Circuit precedent, the link between loyalty and the appearance of
impropriety is clearly recognized." Fortner v International Diving & Consulting Services, Inc., No.
95-1035, 1996 WL 50807 (E.D.La. 1996)

alleges that the conflicts in this case are not waivable and that a new trial is warranted, due to the divided loyalties of the attorneys.  See  U.S. v Schwarz 283 F3d 76 (2nd Cir 2002). The Schwartz case is particularly troubling as the district court had held hearings to insure that the defendant was fully informed of the conflict, the government had argued that the conflicts were not waivable, yet the defendant persisted in waiving the conflict and the district court permitted the waiver. As events unfolded at the trial, the conflict with counsel so permeated the case that the conviction had to be reversed on appeal.

Plaintiffs are very concerned about any possibility of having a successful verdict in this matter being susceptible to challenge on appeal due to any issue of conflicts in representation at trial. The Second Circuit's decision in Schwarz provides a sobering example of the perils involved. Although Schwarz was a criminal prosecution, where there is a heightened concern about conflict-free counsel, the same general principles regarding ethical obligations of counsel apply in civil proceedings. See also Shadid v Jackson 521 F Supp 87 (E.D.Texas 1981) and Marderosian v Shamshak 170 F.R.D. 335 (D.Mass. 1997).

### 4.    If waivable, the conflicts have not been properly waived

The "waivers" presented by the LSU defendant doctors are bereft of any indication that these waivers are "informed". In fact, each of these doctors recites that they do not believe there is any conflict. It is difficult to believe, under these circumstances, that the doctors have been fully informed about these conflicts and that they fully understand to what they are giving their consent. See Wooley v Sweeney 2003 WL 21488411 (S.D.Tex. 2003). Additionally, no waivers have been presented by OPCSO under La. RPC 1.11.

### 4.    Conclusion:

"The rule against representing conflicting interests is designed not only to prevent the

dishonest lawyer from fraudulent conduct, but also to prevent the honest lawyer from having to choose between conflicting duties, rather than to enforce to their full extent the legal rights of each client." <u>Miller v Alagna</u>, 138 F Supp 2d 1252. 1255-56 (C.D.Calif.2000).

The disqualification of counsel in this case does not "benefit" any of the parties or counsel involved. It portends delay, which is in no-one's interest, particularly plaintiffs. It involves additional expense with bringing in new counsel. It is not a particularly pleasant experience for any of the counsel to have to go through the process of disqualification. This is not a course lightly embarked upon nor one that any of the parties or counsel in this case would have chosen. The fortuitous event of the election of Charles C. Foti, Jr., as Attorney General could not have been foreseen at the outset of this case. However, now that this has transpired, it is obvious that the conflicts in this case are unacceptable and incurable except through the admittedly drastic remedy of disqualification. If there is any doubt as to the course of action to take, a Louisiana state circuit court decision examining the policy considerations underlying conflicts issues in consideration of a motion to disqualify counsel , provides some guidance: "...the general rule is that doubts in borderline cases should be resolved in favor of disqualification, with the important injunction being reiterated that, for these reasons, even the appearance of conflict should be avoided." <u>Brasseaux v Girouard</u> 214 So2d 401 (3rd Cir 1968).

It is submitted that this case is not borderline. The conflicts are clear and disqualification is the only appropriate remedy. It is respectfully requested that this Motion be granted.

Respectfully submitted,

MARY E. HOWELL, #7030
Attorney at Law
316 S. Dorgenois Street
New Orleans, LA 70119
(504) 822-4455
**ATTORNEY FOR PLAINTIFFS**

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon counsel for all

parties by placing same in the U.S. Mails, properly addressed and postage prepaid on this 8th

day of _April_, 2004.

_____
MARY E. HOWELL

Duncan: MemoDisqualify.7Apr04

25

# SEE RECORD FOR EXHIBITS OR ATTACHMENTS NOT SCANNED

